IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WILLIE JEFFERSON,

    Plaintiff,

v.

L.C. WARD, *et al.*,

    Defendants.

OPINION AND ORDER

Case No. 15-cv-650-wmc

*Pro se* plaintiff Willie Jefferson, a former inmate at Oxford Federal Correctional Institution ("FCI-Oxford"), was granted leave to proceed in this lawsuit against multiple FCI-Oxford employees for allegedly impeding his ability to pray in accordance with his Muslim faith in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA"). Now before the court is defendants' motion for summary judgment. (Dkt. #42.) For the following reasons, the court will grant defendants' motion and enter judgment in defendants' favor.

UNDISPUTED FACTS[1]

## A. Background

During the relevant time period, plaintiff Willie Jefferson was confined at FCI-Oxford.[2] Jefferson is a devout Muslim, and he prays five times a day at fixed times as his faith mandates.

---

[1] Unless otherwise noted, the following facts are material and undisputed. Viewing the record in a light most favorable to plaintiff, the court has drawn these facts from the parties' proposed findings of fact and responses to those facts, as well as the underlying evidence as needed.

[2] Jefferson has been released from the custody of the Bureau of Prisons ("BOP"), and he currently resides in Florida.

All sued in their official capacities, defendants are employees of FCI-Oxford, and include: L.C. Ward, the warden; David B. Christensen, the camp administrator and administrative remedy coordinator; E. Harris, the associate warden of programs; and Ryan Willis, the Supervisory Chaplain at FCI Oxford.

The court granted Jefferson leave to proceed on his claims that the defendants imposed an unwritten policy, improperly prohibiting him from praying at FCI-Oxford in areas beyond his living quarters and the chapel. For their part, defendants all deny imposing such a policy. On the contrary, they maintain that Jefferson's experiences praying at FCI-Oxford aligned with BOP policies related to religious practices at the time, none of which impeded his ability to pray in accordance with his faith.

**B. FCI-Oxford's Policies and Practices Related to Prayers**

BOP Program Statement 5360.09, Religious Beliefs and Practices, was in effect during the relevant time, which purports to provide "inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices . . . consistent with the security and orderly running of the institution." Institution chaplains are generally tasked with managing religious activities, and they also plan, direct and supervise the religious program at their institution. Chaplains are further guided by a reference manual entitled BOP's "Technical Reference Manual on Practical Guidelines for Administration of Inmate Beliefs and Practice" ("Beliefs and Practice Manual"). That Manual states that inmates may pray in their housing units, *and* with approval, at work detail sites and during school breaks.

### C. Prayer Space at FCI-Oxford

Among other complaints, Jefferson claims that the amount of space available to him in his cell for prayer was inadequate. The BOP has developed a Program Statement ("PS") 1060.11, which sets forth procedures for each institution to determine its "rated capacity." (Ex. 1 to Hall Decl. (dkt. #64-1).) An institution's "rated capacity" is its total inmate capacity less spaces for the hospital and/or infirmary, administrative detention, and disciplinary segregation. According to PS 1060.11, the rated capacity is "the objective measurement of inmate housing space without regard to items such as institution age, location, or infrastructure." Defendants explain that an institution's rated capacity does not actually limit the number of inmates that can be housed in a cell or institution; rather, this calculation bears on BOP budgeting and statistical measurement of prison crowding; and enables the BOP to reasonably and equitably distribute the inmate population across its institutions.

For rating purposes, PS 1060.11 lists the number of inmates appropriate per cell based on cubicle square footage and institution security level. FCI-Oxford is a minimum-security institution, and PS 1060.11(7)(c)(4)(a) provides that in a minimum-level BOP institution, cells smaller than 55 square feet are rated for single occupancy, and cells between 55 and 120 square feet are rated for double occupancy. FCI-Oxford contains 52 cubicles, which are each 122 square feet. Since each cubicle contains two cells, each cell is 61 square feet. Therefore, FCI-Oxford has a total of 104 cells and sufficient space to house up to 208 prisoners.

On July 16, 2014, Warden L.C. Ward signed a Rated Capacity Computation Form that Jefferson claims contained fraudulent information about the amount of space within each cell at FCI-Oxford. Defendants explain that the form correctly shows that FCI-Oxford has 104 cells with a rated capacity for double occupancy, and therefore, a total capacity of 208 inmates. However, defendants also acknowledge that the form Jefferson submitted contains an error: it listed each cell to be 115 square feet, rather than 122 square feet. (Ex. 6 to Jefferson Decl. (dkt. #55-6), at 2.) Their position is that this error is meaningless since the double capacity rating goes down to 55, meaning this mistake has no bearing on the number of prisoners that may be placed in a cubicle or cell, making the same total capacity claim of 208. Finally, Ward avers that while he signed the 2014 Rated Capacity Computation, he did not personally conduct the square feet calculations on the form, and in any event, the 208 figure on the form was correct as explained above.

Further, the "American Correctional Association" ("ACA") accredited FCI-Oxford on January 23, 2017, as meeting the standards for Occupancy and Space Requirements for Adult Correctional Institutions. Nevertheless, Jefferson maintains that Warden Ward fraudulently deceived the ACA by submitting the form that miscalculated FCI-Oxford's rated capacity. Again, defendants' position is that there was no fraud, and Jefferson has no evidence to support that contention beyond the seemingly immaterial 2014 line item error in the Rated Capacity Computation.

In addition, using the Beliefs and Practice Manual as a guide when Jefferson was incarcerated, officials at FCI-Oxford permitted him to pray any time in his cell or in the

4

chapel, to which he had access between 5:30 a.m. and 9:30 p.m. each day, unless it fell within the 10 hours a week the chapel is reserved for specific religious services.

**D. Jefferson's 2015 Request for Prayer Space at 4 a.m.**

Jefferson claims that at some point in 2015, he could not perform his 4:00 a.m. prayers because: (1) he was not allowed to go to chapel at that time of day; and (2) since FCI-Oxford's rated capacity was incorrectly calculated, he had insufficient space to pray in his cell. Unfortunately, Jefferson provides no details about specifically how he was limited in his ability to pray. For example, he has not averred that he did not have a clean space to roll out a rug or towel on which he could conduct his prayers in his cell, which even accepting the slightly smaller dimensions, would appear to accommodate that act.

Still, to address his alleged concern, Jefferson submitted a typewritten request on May 18, 2015, to Chaplain Willis, asking to use the chapel or tv room for five minutes for his 4:00 a.m. morning prayer.[3] Jefferson explained in this request that he was unable to pray within his living quarters due to a lack of space. On June 24, 2015, Jefferson further initiated an informal administrative remedy, arguing that FCI-Oxford's "unwritten policy restricting an inmate prayer to only his living quarters or Chapel be discontinued." (Ex. 3 (dkt. #55-3) at 2.) On July 2, 2015, Chaplain Willis resolved the complaint against

---

[3] Jefferson also submitted exhibits related to a 2014 disciplinary proceeding involving four other inmates who were punished for praying in the "card room." (Ex. 2 (dkt. #55-2) at 2.) According to the incident report, an officer noticed that four inmates were gathered in the card room engaged in Muslim prayer on May 1, 2014. They were subsequently disciplined because the chaplain had previously directed inmates to gather for prayer only in the chapel, in their cells or as otherwise authorized. Jefferson has not suggested that he was involved in this disciplinary proceeding in any way. Given that Jefferson is challenging his apparent inability to go to chapel at 4:00 a.m., not his ability to pray in a group, this incident does not appear to be material to his claim, or if it is, only tangentially so.

5

Jefferson because the institution had designated areas for prayer, including both indoor and outdoor chapel areas, and inmate cells/cubicles. According to Chaplain Willis, this was the proper result because inmates are not allowed to leave their cells between 10:00 p.m. and 5:30 a.m., unless they need to use the restroom or go to work. Willis explains that this policy preserves both security and the orderly running of the institution.

On July 8, 2015, FCI-Oxford took up Jefferson's formal request for administrative remedy, which repeated his challenge to the requirement that he pray only in his living quarters or the chapel. Still without meaningful explanation, he again maintained that he was unable to perform his prayer in his living quarters because "the rated capacity" for his living quarters had been incorrectly computed, and there were "too many inmates" assigned to his living quarters. Jefferson further argued that the policy restricting prayer to his living quarters or the chapel violated his rights under the RFRA, attaching as support what appears to be a page from FCI-Oxford's policies related to religious practices.

The page Jefferson submitted includes an overview of the ritual washing and prayer that are part of the Muslim faith. (Dkt. #55-4 at 4.) In particular, that page includes the following four items for consideration for the daily prayers:

1. Inmates should have [the] opportunity to pray five times daily.
2. Other than Jumu'ah, it is recommended that prayers be made individually or in very small groups (2 or 3 inmates) throughout the day.
3. Prayers can be made at work detail sites, school or units during break times.
4. This requires a clean area, prayer rug or clean towel to cover the floor.

(*Id.*) On July 9, 2015, Jefferson's administrative remedy request was again rejected because: (1) Jefferson neither attempted to resolve this issue informally, nor did he provide

6

evidence that he attempted to resolve it informally; and (2) Jefferson raised more than one issue.

OPINION

The RFRA provides that the government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the burden furthers "a compelling governmental interest" by "the least restrictive means." 42 U.S.C. §§ 2000bb-1(a)-(b); *Jolly v. Coughlin*, 76 F.3d 468, 474-75 (7th Cir. 1996). The RFRA is applicable to federal prison officials. *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003). The RFRA defines a "substantial burden" as one "that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). Moreover, a "religious exercise" is defined broadly as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). If a plaintiff establishes that a policy substantially burdens his religious practice, the burden shifts to the defendants to prove that the policy furthers a compelling interest by the least restrictive means.

Certainly, plaintiff's religious exercise includes the need to pray 5 times per day in a suitable space. Based on the evidence of record, however, a reasonable trier of fact could not conclude that plaintiff's religious exercise has ever been substantially burdened. While plaintiff's position is that his cell was too small for him to conduct his 4:00 a.m. prayers, he has still not provided *evidence* to support this assertion. Instead, plaintiff continues to rely principally on a mistaken line item in the 2014 Rated Capacity Form, but that mistake

7

gets him nowhere. First, plaintiff has submitted *no* evidence to support his assertion that the Rated Capacity Form actually sets housing requirements, and in fact, Ward has averred that the Rated Capacity Form relates only to BOP statistics and budgetary issues, and plaintiff has submitted no evidence to the contrary. Second, defendants point out that the only miscalculation on the 2014 Rated Capacity Form -- the insertion of 115 rather than 122 square feet on the line for "cubicle measurement" at FCI-Oxford -- had no bearing on the rated capacity and total capacity of prisoners at the institution (208), much less on prayer space within a cell. Plaintiff does not dispute this. Accordingly, plaintiff has wholly failed to tie the Rated Capacity Computation Form error, *or* his related challenge to the allegedly fraudulent ACA accreditation, to his claim that his cell space substantially burdened his ability to perform his 4:00 a.m. prayer, particularly given the obvious impracticality of allowing inmates to leave their cells and congregate in the chapel at that early hour.

That leaves the court with plaintiff's wholly unsupported assertion that his cell space was insufficient to permit him to pray. Indeed, plaintiff has failed to provide *any* context for this assertion, such as a general description of the amount of space he needed to perform his prayers or the actual limitations presented by his available cell space. As such, the record is devoid of any evidence that would permit a reasonable juror to find plaintiff was unable to pray in his cell at 4 a.m.

"[S]ummary judgment is the 'put up or shut up' moment in a lawsuit." *Sigel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). Given that plaintiff has failed to submit even a "scintilla

of evidence in support of [his] position," such that a jury could reasonably find in favor of his position that his cell space substantially burdened his ability to pray, his claim cannot survive. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Furthermore, defendants contend that to the extent plaintiff could submit sufficient evidence to create a genuine issue as to whether they violated his rights under the RFRA, defendants are entitled to qualified immunity with respect to plaintiff's claims for monetary damages. Qualified immunity ordinarily protects government employees from liability for actions taken within the scope of their employment. Of course, qualified immunity would not apply if defendants' conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "In determining whether a constitutional right has been clearly established, it is unnecessary for the *particular* violation in question to have been previously held unlawful." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added)).

Instead, the question is whether the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. As to this question, plaintiff has the burden of identifying a "closely analogous case that established a right to be free from the type" of restriction imposed. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (quoting *Findlay v. Lendermon,* 722 F.3d 895, 899 (7th Cir. 2013)). To that extent, clearly established law

9

should not be defined "at a high level of generality," but rather should be "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

Setting aside plaintiff's failure to submit evidence that would permit a reasonable fact finder to find that his religious practice was substantially burdened, it is undisputed that defendants declined his request to pray in the chapel at 4 a.m. due to safety and security concerns at the prison. Given that plaintiff has failed to cite *any* decision establishing that defendants' refusal to permit him to pray in the chapel outside of the prescribed hours violated his rights under the RFRA, defendants are immune from monetary damages on plaintiff's claims.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #42) is GRANTED.

2. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 10th day of January, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge